UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ANTHONY LEHR, et al.,                    No. 2:07-cv-01565-MCE-GGH

      Plaintiffs,

    v.                                   <u>MEMORANDUM AND ORDER</u>

CITY OF SACRAMENTO, et al.,

      Defendants.

----oo0oo----

Plaintiffs initiated this action on August 2, 2007, and filed a First Amended Complaint ("FAC") on August 31, 2007. Defendants City of Sacramento, Police Chief Albert Najera, and Officers Mike Cooper and Mark Zoulas (collectively "City Defendants"), have now moved for summary judgment, or in the alternative, summary adjudication as to Plaintiffs' first and second causes of action by which Plaintiffs claim 1) that City Defendants' enforcement of Sacramento's "anti-camping" ordinance against Plaintiffs is cruel and unusual in violation of the Eighth Amendment, and 2) that City employees have operated to unconstitutionally deprive Plaintiffs of their property in violation of the Fourth and Fourteenth Amendments.

The Court heard oral arguments on April 30, 2009, and now grants in part and denies in part Defendants' Motion.

**BACKGROUND**

## 1. The Plaintiffs[1]

Eleven individual Plaintiffs and three entities filed this action.

### A. Anthony Lehr

Plaintiff Anthony Lehr has been homeless since 2001, when he exhausted the money he had received from Workers' Compensation for injuries sustained on the job as a carpenter. He is forty-five years old and sleeps outside on those nights he is not eligible for emergency shelter housing. Plaintiff Lehr is currently employed by Plaintiff Loaves & Fishes, but his earnings do not allow him to afford permanent housing.

### B. Connie Hopson

Plaintiff Connie Hopson has been intermittently homeless since 1992. She is fifty-four years old. She is unable to work because of health problems and receives $940 per month from social security insurance, which is not enough to rent permanent housing and to have money for food, utilities, and other expenses.

---

[1] Party descriptions, to the extent they are undisputed, are taken largely verbatim from the FAC.

2

She is currently homeless and disabled due to a degenerative
spinal disease.

On June 29, 2006, at 5:30 a.m., while Plaintiff Hopson was
sleeping on the sidewalk in the City of Sacramento, she was
criminally cited by unnamed city police officers for illegal
camping.  Those officers also confiscated and destroyed, without
notice or opportunity to reclaim, her clothes, sleeping bag,
personal papers, bible, pictures, medication, and remaining
possessions, leaving only two blankets.  Her property was
allegedly thrown into a trailer with that of other homeless
individuals.

**C.    Floyd Hopwood**

Plaintiff Floyd Hopwood has been intermittently homeless
since 2002.  He is fifty-six years old.  He has a disabling
injury to his knee, and needs surgery, but he has not been able
to arrange for the procedure because he needs housing during the
period of recuperation.  He is only sporadically able to find
available space in homeless shelters.  For three months out of
the year, his only income is $160 per month from General
Assistance, though he does collect $155 per month in food stamps
as well.

On March 20, 2007, at approximately 6:30 a.m., Plaintiff
Hopwood was cited by Defendant Cooper for unlawfully camping
within the city.  Those charges were eventually dismissed.

///

///

## D.   Michael Tinius

Plaintiff Michael Tinius, now deceased, had been homeless since 1989.  He was forty-seven years old.  He had a dog and refused to apply to stay in shelters because of various restrictions, including those related to religion and pets.  His dog was necessary for security and companionship.  He was not employed and had no income.

## E.   Jacki Fitzgerald

Plaintiff Jacki Fitzgerald and her husband are currently homeless.  She is forty-six years old and has been homeless and impoverished since the age of twenty-three.  She was assaulted in a shelter as a young woman in Seattle and is now afraid to stay at such locations.  She has a watchdog, and pets are not allowed in emergency shelters in Sacramento.

In approximately January of 2007, Sacramento police officers cited Plaintiff Fitzgerald and her husband for illegally camping within the City.  She was required to do community service as a result of the citation.

## F.   Jeremy McEntyre

Plaintiff Jeremy McEntyre is currently homeless.  He is thirty-seven years old.  He first became homeless in 1991, when drug use led to losing his job and apartment. He is a construction worker, but without a car it is difficult for him to obtain work.

He has lived in various shelters, including the Salvation Army, the Volunteers of America Shelter, and the Clean and Sober New Start Shelter, but "timed out" of them in early 2007.

On March 17, 2007, before 7:00 a.m., Plaintiff McEntyre was awakened and cited by Officers Cooper and Zoulas for illegal camping. He was taken into custody on pending warrants.

### G.   Tammy Jones

Plaintiff Tammy Jones became intermittently homeless in July of 2006, and is currently renting an apartment. She is thirty-six years old. She and her husband have earned money by waving street signs for various businesses. Currently, she has a job at the Salvation Army shelter for $7.50 per hour. Her paycheck goes to pay rent and she depends on Loaves & Fishes for food. She stayed in shelters from October of 2005 through February of 2006, but had to leave when she exhausted the applicable time limits.

On February 25, 2007, Plaintiff Jones was cited for illegal camping. At 5:30 a.m. that morning, Defendants Cooper and Zoulas awakened Plaintiff Jones and advised her to move. Later, the Defendant Officers returned and advised Plaintiff Jones that if she did not leave she would be arrested and her belongings taken.

///
///
///
///
///
///

### H.   Michael Moore

Plaintiff Michael Moore is currently living in a residential drug and alcohol program.  He is fifty-five years old.  He first became homeless in 1989 and has been homeless about one third of the time since.  He has stayed in various shelters in Sacramento, both at the Salvation Army and the overflow shelter at Cal Expo. He was expelled from Clean & Sober when he discontinued taking his medications and stayed out all night.  Thereafter, he camped occasionally in the American River Parkway and the rail yard.

In approximately June or July of 2006, Plaintiff Moore was cited for illegal camping by Defendants Cooper and Zoulas.

### I.   Lindsey Alesso

Plaintiff Lindsey Alesso, who is thirty-six years old, is currently living at Bridges Transitional Housing for Women, where she is recovering from drug addiction.  She has been homeless ninety percent of the time since 2000, when her husband died and she had to leave the home owned by his family.  She has previously stayed in the Salvation Army shelter.

### J.   Valerie Dufour

Plaintiff Valerie Dufour was homeless about seventy-five percent of the time between September 2004 and April 2007. She is fifty-two years old.  She has spina bifida which causes numbness in her lower extremities, hearing loss, and hypothyroidism.

She has a monthly income of $206 from General Assistance for
three months per year, and receives $150 per month in food
stamps.  In the winter of 2006-2007, she stayed one night at the
Salvation Army homeless center, and one night at the winter
shelter operated by Sacramento County at Cal Expo.  She does not
feel safe in the shelters because she had property stolen there
while she slept.

In the summer of 2006, Plaintiff Dufour was cited by unnamed
Sacramento police officers for trespassing while sleeping in a
business parking lot where she had permission to stay.  The
ticket was later dismissed.

### K.    Ronald Hicks

Plaintiff Ronald Hicks has been homeless since March 2007.
He is fifty-six years old.  He is disabled and has been
intermittently employed, but does not have enough income to rent
permanent housing.  Plaintiff Hicks depends upon emergency
shelters in Sacramento for housing, but cannot avoid sleeping
outside because of the time limitations on consecutive nights.
He has stayed at the Salvation Army Shelter, the winter shelter
at Cal Expo, which operates until the end of March, and the Union
Gospel Mission.  He has been forced to sleep outside along the
American River when unable to qualify for emergency housing.
///
///
///
///

**L. Loaves & Fishes**

Plaintiff Loaves & Fishes is a non-profit charity located in Sacramento, California, whose stated mission is to feed the hungry and shelter the homeless. Open on a daily basis, Loaves & Fishes provides food for as many as one-thousand people each day. Loaves & Fishes also provides homeless individuals with clothing, blankets, and other personal necessities.

**M. Francis House**

Plaintiff Francis House is a non-profit organization in Sacramento, California, supported by seventeen churches and the community at large. It provides resources and counseling services to the poor. These services vary from making referrals to a food closet and providing motel vouchers to more complex advocacy assistance.

**N. Sacramento Homeless Organizing Committee ("SHOC")**

Plaintiff SHOC is an unincorporated association of homeless and formerly homeless people and their supporters, whose mission is to advocate for and defend the rights of homeless people.

///
///
///
///
///

## 2.    The Moving Defendants

The Moving Defendants are the City of Sacramento, former Chief of Police Albert Najera, and individual Officers Mike Cooper and Mark Zoulas.

## 3.    Additional Factual Background[2]

According to Plaintiffs' expert, the vast majority of homeless people on the streets at any given time have neither a legal place to go nor sufficient resources to obtain one.  This is allegedly true absent any decisions they might make over whatever resources they do control, except perhaps in the very long term and with the assistance of multiple programs or institutions.  While no generalization can adequately describe the diverse population of homeless people in Sacramento, most of these individuals and families are poor, and without the resources to pay for stable housing.  A large percentage are disabled, either physically or mentally, and, in addition, have problems with substance abuse.

Plaintiffs' expert further opines that rarely, if ever, does a person choose to be homeless and live exposed to the elements, the dangers of the street, the unsanitary conditions, and the fear of arrest.

///

_____

[2] The following facts are taken verbatim from Moving Defendants Statement of Undisputed Facts and Plaintiffs' Opposition thereto, as well as from Plaintiffs' Supplemental Statement of Facts and Defendants' Opposition thereto.

Rather, their homelessness is allegedly due to factors beyond their control, such as poverty (which is linked to their inability to get medical care, governmental assistance, and employment), social isolation, mental and physical illness and disability, combined with alcoholism and other addictions.

Sacramento has implemented a "Ten Year Plan to End Chronic Homelessness" ("Plan"), under which it is estimated that 1200 to 2200 individuals are in need of permanent housing on any given night. Additionally, one survey demonstrated that sixty percent of the homeless in Sacramento are considered to be "chronically" homeless, meaning they were unaccompanied individuals with a disabling condition who had been homeless for a year or more, or, alternatively, had experienced at least four episodes of homelessness within three years.

Finally, Plaintiffs produced evidence that Sacramento City shelters cannot accommodate all homeless each night. According to Sacramento County Department of Human Assistance, there are an estimated 2,700 homeless people on the street on any night, but the county provides only approximately 1500 emergency shelter and transitional beds. Thus, over 1200 individuals are alleged to sleep outside.

Based on the above asserted facts, Plaintiffs brought the instant as-applied challenge to the enforcement of city ordinances prohibiting camping within the city as well as to the enforcement of alleged city policies and customs by which officers confiscate the personal property of homeless individuals.

///

10

Defendants challenge each of Plaintiffs' first two causes of
action via their Motion for Summary Judgment or Summary
Adjudication. For the following reasons, the City Defendants'
Motion is granted as to Plaintiffs' first claim and granted in
part and denied in part as to Plaintiffs' second claim.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary
judgment when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law." Fed. R. Civ. P. 56(c). One of the
principal purposes of Rule 56 is to dispose of factually
unsupported claims or defenses. Celotex Corp. v. Catrett, 477
U.S. 317, 323-324 (1986).

Rule 56 also allows a court to grant summary adjudication on
part of a claim or defense. See Fed. R. Civ. P. 56(a) ("A party
seeking to recover upon a claim ... may ... move ... for a
summary judgment in the party's favor upon all or any part
thereof."); see also Allstate Ins. Co. v. Madan, 889 F. Supp.
374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter
Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).
The standard that applies to a motion for summary adjudication is
the same as that which applies to a motion for summary judgment.
See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F.
Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. at 323(quoting Rule 56(c)). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). Stated another way, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

Anderson, 477 U.S. at 251 (quoting Schuylkill and Dauphin
Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)).  As the
Supreme Court explained, "[w]hen the moving party has carried its
burden under Rule 56(c), its opponent must do more than simply
show that there is some metaphysical doubt as to the material
facts .... Where the record taken as a whole could not lead a
rational trier of fact to find for the nonmoving party, there is
no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586-87.

In resolving a summary judgment motion, the evidence of the
opposing party is to be believed, and all reasonable inferences
that may be drawn from the facts placed before the court must be
drawn in favor of the opposing party. Anderson, 477 U.S. at 255.
Nevertheless, inferences are not drawn out of the air, and it is
the opposing party's obligation to produce a factual predicate
from which the inference may be drawn.  Richards v. Nielsen
Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),
aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

As a threshold matter, the parties have narrowed the scope
of the instant dispute via their pleadings and oral arguments.

First, Plaintiffs do not oppose the instant Motion to the
extent it is directed toward SHOC.  Accordingly, the City
Defendants' Motion is granted as to SHOC.

///

///

///

13

Next, via their Statement of Partial Non-Opposition, Plaintiffs clarify that they do not oppose the instant Motion insofar as it asserts damages claims against the individual City Defendants. However, because the individual City Defendants' Motion is below granted as to both challenged causes of action, Plaintiffs' non-opposition is subsumed into those holdings.

Additionally, Plaintiffs argue that Plaintiffs Lehr, Hicks, Alesso, and Tinius never alleged claims against any of the City Defendants, and that, consequently, it would be improper for this Court to grant the City Defendants' instant Motion. The City Defendants disagree arguing that Plaintiffs did not make such distinctions by way of their Complaint and that, since there is no evidence supporting these Plaintiffs' claims against the City, Defendants' Motion should be granted. The Court agrees with the City. Each cause of action is pled on behalf of the Plaintiffs as a group, and nowhere within their pleadings do Plaintiffs allege that only certain Plaintiffs bring certain claims against certain Defendants. Accordingly, the City Defendants' Motion is granted as to the first and second causes of action of Plaintiffs Lehr, Hicks, Alesso, and Tinius.

Finally, it became clear at oral argument that no Plaintiffs allege any of the individual City Defendants ever confiscated their property. Accordingly, with no evidence in the record to support the claims directed at the individual Defendants, Plaintiffs' second cause of action against them cannot stand. The individual City Defendants' Motion to Dismiss is thereby granted as to all of Plaintiffs' second cause of action.

///

14

Thus, the only claims remaining for this Court's analysis are those brought under the first cause of action by Plaintiffs Hopson, Hopwood, Fitzgerald, McEntyre, Jones, Moore, DuFour, Loaves & Fishes, and Francis House against all City Defendants for violation of the Eighth Amendment and those brought under the second cause of action by the same Plaintiffs against the City of Sacramento only for violation of their Fourth and Fourteenth Amendment rights.

**1.    First Cause of Action: Violation of the Eighth Amendment**
**      A.    Overview of Plaintiffs' Claims**

Plaintiffs assert that the enforcement of City of Sacramento anti-camping ordinances as-applied to each of them constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.  "[T]he Cruel and Unusual Punishments Clause circumscribes the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such."  Ingraham v. Wright, 430 U.S. 651, 667 (1977).  The last limitation, which is at issue here, is "to be applied sparingly."  Id.  Despite the Supreme Court's admonition, Plaintiffs rely on that limitation to argue that the prohibition on camping within the City of Sacramento is unconstitutional.

///

According to the Sacramento City Code, "[i]t is unlawful and a public nuisance for any person to camp, occupy camp facilities, or use camp paraphernalia" or to "store personal property, including camp paraphernalia" on either public or private property. Sacramento, Cal., City Code, tit. 12, § 12.52.030, 12.52.040. "'Camp' means to place, pitch or occupy camp facilities; to live temporarily in a camp facility or outdoors; to use camp paraphernalia." Id., § 12.52.020. "'Camp facilities' include, but are not limited to, tents, huts, vehicles, vehicle camping outfits or temporary shelter," and "'Camp paraphernalia' includes, but is not limited to, bedrolls, tarpaulins, cots, beds, sleeping bags, hammocks or cooking facilities and similar equipment." Id. Finally, "'[p]ublic property' means all public property including, but not limited to, streets, sidewalks, alleys, improved or unimproved land and parks." Id.

This "anti-camping" ordinance was enacted for the following stated purpose:

> The streets and public areas within the city should be readily accessible and available to residents and the public at large. The use of these areas for camping purposes or storage of personal property interferes with the rights of others to use the areas for which they were intended. Such activity can constitute a public health and safety hazard which adversely impacts neighborhoods and commercial areas. Camping on private property without the consent of the owner, proper sanitary measures and for other than a minimal duration adversely affects private property rights as well as public health, safety, and welfare of the city. The purpose of this chapter is to maintain streets, parks and other public and private areas within the city in a clean, sanitary and accessible condition and to adequately protect the health, safety and public welfare of the community, while recognizing that, subject to reasonable conditions, camping and camp facilities associated with special events can be beneficial to the cultural and educational climate in the city.

> Nothing in this chapter is intended to interfere with otherwise lawful and ordinary uses of public or private property.

Id., § 12.52.010

According to Plaintiffs, the above ordinances make it a "criminal offense for homeless individuals to 'be' outside, anywhere in the city, at all times of day or night, if they maintain their possessions for camping at that place, or to use such camping possessions, like a sleeping bag or tent, at that place." Opposition, 12:17-20. Moreover, Plaintiffs argue that "[i]f, because they cannot afford housing or because there is inadequate shelter, people have nowhere to 'be' but outside, the criminal ordinance that prohibits maintaining or using camping equipment effectively punishes them for being homeless - an involuntary condition." Id., 12:20-23. Thus, the remaining Plaintiffs argue that enforcement of the above regime is unconstitutional as contrary Cruel and Unusual Punishment Clause of the Eighth Amendment. City Defendants now move for summary adjudication of this claim as to all Plaintiffs.

**B. Plaintiffs' Standing**

Defendants first challenge whether Plaintiffs even have standing to raise an Eighth Amendment claim. According to Defendants, "[t]he Eighth Amendment protection against cruel and unusual punishment can only be invoked by persons convicted of crimes." Motion, 12:1-2. Thus, Defendants contend that any Plaintiff failing to submit evidence of an actual conviction lacks standing to pursue the instant claim.

17

Plaintiffs disagree citing to the Ninth Circuit decision in
Jones v. Los Angeles, 444 F.3d 1118 (9th Cir. 2006), vacated by
505 F.3d 1006 (9th Cir. 2007).  Defendants, however, oppose
affording any deference to Jones since it was subsequently
vacated pursuant to the terms of the parties' settlement
agreement.  This Court finds that, though the Jones opinion is
informative, it is not binding, and the Court will limit the
weight given the decision accordingly.  See DHX, Inc. V. Allianz
AGF MAT, Ltd., 425 F.3d 1169, 1175-1176 (9th Cir. 2005) (Beezer,
J., concurring) ("at a minimum, a vacated opinion still carries
informational and perhaps even persuasive or precedential
value").

Indeed, on the issue of standing, Jones is highly
persuasive.  "Article III of the Constitution requires a
plaintiff seeking to invoke the jurisdiction of the federal
courts to allege an actual case or controversy.  To satisfy the
case or controversy requirement, the party invoking a court's
jurisdiction must 'show that he personally has suffered some
actual or threatened injury as a result of the putatively illegal
conduct of the defendant, and that the injury fairly can be
traced to the challenged action and is likely to be redressed by
a favorable decision."  Jones, 444 F.3d at 1126, quoting Valley
Forge Christian Coll. v. Ams. United For Separation of Church and
State, Inc., 454 U.S. 464, 472 (1982).  "In a suit for
prospective injunctive relief, a plaintiff is required to
demonstrate a real and immediate threat of future injury."  Id.
///
///

18

Plaintiffs have submitted evidence that some of them have been cited or convicted and, thus, have demonstrated such a threat exists here.

Nonetheless, in this case as in Jones, Defendants continue to improperly rely "upon dicta in Ingraham, 430 U.S. 651, for the proposition that the Cruel and Unusual Punishment Clause attaches only postconviction." Jones, 444 F.3d at 1127. However, "Ingraham rests on the distinction between state action inside and 'outside the criminal process,' not on any distinction between criminal convictions and preconviction law enforcement measures such as arrest, jailing, and prosecution." Id., at 1128, quoting Ingraham, 430 U.S. 667. "Ingraham does not establish that the Cruel and Unusual Punishment Clause only attaches postconviction. In fact, the Ingraham decision expressly recognizes that the Clause 'imposes substantive limits on what can be made criminal,' a protection that attaches before conviction." Id., quoting Ingraham, 430 U.S. at 667.

As the Jones Court pointed out, "[t]he Cruel and Unusual Punishment Clause's third protection...differs from the first two in that it limits what the state can criminalize, not how it can punish. This protection governs the criminal law process as a whole, not only the imposition of punishment postconviction." Id. Accordingly, proof of a conviction is not a prerequisite to a constitutional claim.

///
///
///
///

19

1    Regardless, "[a]lthough a conviction is not required to
2    establish standing for prospective relief from enforcement of a
3    criminal law against a status or behavior that may not be
4    criminalized under the Eighth Amendment," in this case, multiple
5    Plaintiffs have been cited or convicted.  Id., 444 F.3d at 1130.
6    "If a conviction is constitutionally required, the fact that
7    [some of the] plaintiffs were convicted suffices to establish
8    standing for all."  Id., citing Leonard v. Clark, 12 F.3d 885,
9    888 (9th Cir. 1993).  Accordingly, the individual Plaintiffs have
10   standing to raise this Eighth Amendment claim.

11   Finally, Defendants assert that the entity Plaintiffs lack
12   standing as they are not citizens or other persons able to bring
13   claims under 42 U.S.C. § 1983.  However, the Court need not
14   address this argument because its disposition of Plaintiffs'
15   first cause of action on the merits renders moot the need for any
16   further discussion.

17

18       **C.   The Merits of Plaintiffs Eighth Amendment Cause of
             Action**
19

20   First and foremost, while the Court agrees with the Jones
21   conclusion that conviction is not a prerequisite to bringing the
22   instant Eighth Amendment claim, the Court's analysis of the merits
23   of this cause of action requires a fundamental departure from Jones.

24   In opposing the instant Motion, Plaintiffs rely almost
25   entirely on that decision.  However, as a threshold matter, the
26   Court notes that, not only was the Jones decision subsequently
27   vacated, it was issued by a panel split 2-1, and was accompanied
28   by a powerful dissent.

20

Moreover, the majority's decision turned almost entirely on an analysis of two Supreme Court cases, <u>Robinson v. California</u>, 370 U.S. 660 (1962), and <u>Powell v. Texas</u>, 392 U.S. 514 (1968), both decided in the 1960's, both involving facts distinguishable from the instant case, and the latter of which was issued by an entirely fractured Court. Indeed, the <u>Jones</u> majority itself reached its conclusion largely by piecing together concurring and dissenting opinions from <u>Powell</u>. Accordingly, the present discussion most properly begins with a look at those prior cases that provide the basis for the more recent applicable law.

The first case relevant to the instant decision was <u>Robinson</u>, 370 U.S. 660. The Supreme Court in <u>Robinson</u> was faced with a California statute that made it a "criminal offense for a person to 'be addicted to the use of narcotics.'" <u>Id</u>. In that case, the jury in the Los Angeles criminal trial was instructed that "[t]he appellant could be convicted...if they found simply that the appellant's 'status' or 'chronic condition' was that of being 'addicted to the use of narcotics.'" <u>Id</u>., 370 U.S. at 665. The Supreme Court observed:

> This statute, therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment. Rather, we deal with a statute which makes the 'status' of narcotic addiction a criminal offense, for which the offender may be prosecuted 'at any time before he reforms.' California has said that a person can be continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of any antisocial behavior there. It is unlikely that any state at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease.

A state might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

Id., 370 U.S. at 666.

That Court concluded, "We cannot but consider the statute before us as of the same category. In this Court, counsel for the State recognized that narcotic addiction is an illness. Indeed, it is apparently an illness which may be contracted innocently or involuntarily. We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment." Id., 370 U.S. at 667.

Approximately six years later, in Powell, the Supreme Court entertained arguments from an appellant who "was arrested and charged with being found in a state of intoxication in a public place." 392 U.S. at 517. The Powell Court split with, inter alia, four Justices announcing the judgment of the Court, Justice White concurring in the result, and the four remaining Justices issuing a dissent.

In that case, at the appellant's criminal trial, the trial court entered the following "findings of fact: (1) That chronic alcoholism is a disease which destroys the afflicted person's will power to resist the constant, excessive consumption of alcohol.

(2) That a chronic alcoholic does not appear in public by his own volition but under a compulsion symptomatic of the disease of chronic alcoholism. (3) That...defendant herein...is a chronic alcoholic who is afflicted with the disease of chronic alcoholism.'" Id., 392 U.S. 521.

However, the plurality in Powell rejected those "findings" stating, "Whatever else may be said of them, those are not 'findings of fact' in any recognizable, traditional sense in which that term has been used in a court of law; they are the premises of a syllogism transparently designed to bring this case within the scope of this Court's opinion in Robinson . . . The dissent would have us adopt these 'findings' without critical examination; it would use them as the basis for a constitutional holding that 'a person may not be punished if the condition essential to constitute the defined crime is part of the pattern of his disease and is occasioned by a compulsion symptomatic of the disease.'" Id.

The plurality rejected the dissent's view, finding the record inadequate to support the articulation of such a wide-reaching constitutional doctrine. Id. Moreover, according to the plurality opinion, "the inescapable fact is that there is no agreement among members of the medical profession about what it means to say that 'alcoholism' is a 'disease.'" Id., 392 U.S. at 522.

Additionally, the plurality Justices determined that the Powell case failed to fall within the Robinson holding "since appellant was convicted, not for being a chronic alcoholic, but for being in public while drunk on a particular occasion."

23

Id., 392 U.S. at 532.  Accordingly, "[t]he State of Texas thus ha[d] not sought to punish a mere status, as California did in Robinson; nor ha[d] it attempted to regulate appellant's behavior in the privacy of his own home. Rather it ha[d] imposed upon appellant a criminal sanction for public behavior which may [have] create[d] substantial health and safety hazards, both for appellant and for members of the general public, and which offend[ed] the moral and esthetic sensibilities of a large segment of the community. [That] seem[ed] a far cry from convicting one of being an addict, being a chronic alcoholic, being 'mentally ill, or a leper.'"  Id., quoting Robinson, 370 U.S. at 666.

The plurality then opined that "Robinson so viewed brings this Court but a very small way into the substantive criminal law.  And unless Robinson is so viewed it is difficult to see any limiting principle that would serve to prevent this Court from becoming, under the aegis of the Cruel and Unusual Punishment Clause, the ultimate arbiter of the standards of criminal responsibility, in diverse areas of the criminal law, throughout the country."  Id., 392 U.S. at 533.

The plurality Justices then made observations quite pertinent to the issues before the Court today when they stated:

It is suggested in dissent that Robinson stands for the 'simple' but 'subtle' principle that '(c)riminal penalties may not be inflicted upon a person for being in a condition he is powerless to change.'  In that view, appellant's 'condition' of public intoxication was 'occasioned by a compulsion symptomatic of the disease' of chronic alcoholism, and thus, apparently, his behavior lacked the critical element of mens rea. Whatever may be the merits of such a doctrine of criminal responsibility, it surely cannot be said to follow from Robinson.

24

The entire thrust of Robinson's interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has in interest in preventing, or perhaps in historical common law terms, has committed some actus reus. It thus does not deal with the question of whether certain conduct cannot constitutionally be punished because it is, in some sense, 'involuntary' or 'occasioned by a compulsion.' Likewise, as the dissent acknowledges, there is a substantial definitional distinction between a 'status,' as in Robinson, and a 'condition,' which is said to be involved in this case. Whatever may be the merits of an attempt to distinguish between behavior and a condition, it is perfectly clear that the crucial element in this case, so far as the dissent is concerned, is whether or not appellant can legally be held responsible for his appearance in public in a state of intoxication. The only relevance of Robinson to this issue is that because the Court interpreted the statute there involved as making a 'status' criminal, it was able to suggest that the statute would cover even a situation in which addiction had been acquired involuntarily. That this factor was not determinative in the case as shown by the fact that there was no indication of how Robinson himself had become an addict.

Id., 392 U.S. 533-534.

Nevertheless, despite the plurality's compelling argument that Robinson could not be extended to immunize the conduct at issue in Powell, the four-Justice dissent took the much broader approach alluded to above, stating to the contrary, "Robinson stands upon a principle which, despite its subtlety, must be simply stated and respectfully applied because it is the foundation of individual liberty and the cornerstone of the relations between a civilized state and its citizens: Criminal penalties may not be inflicted upon a person for being in a condition he is powerless to change." Id., 392 U.S. 567 (Fortas, J., dissenting).

///

///

25

Accordingly, in light of the drastic differences of opinion emanating from the <u>Powell</u> Court, and the sound logic supporting the plurality opinion, this Court is reluctant to now extend the original <u>Robinson</u> rationale any further than is absolutely necessary.

However, nearly forty years after <u>Powell</u>, the majority in <u>Jones</u> did just that, synthesizing the above cases to reach its conclusion that a "City of Los Angeles ordinance that criminalize[d] sitting, lying, or sleeping on public streets and sidewalks at all times and in all places within Los Angeles's city limits" could not be constitutionally applied to that city's homeless population. 444 F.3d at 1120. The <u>Jones</u> court determined that "[t]he City could not expressly criminalize the status of homelessness by making it a crime to be homeless without violating the Eighth Amendment, nor can it criminalize acts that are an integral aspect of that status." <u>Id</u>., 444 F.3d at 1132. Accordingly, that court reasoned "[b]ecause there is substantial and undisputed evidence that the number of homeless persons in Los Angeles far exceeds the number of available shelter beds at all times, including on the nights of their arrest or citation, Los Angeles has encroached upon Appellants' Eighth Amendment protections by criminalizing the unavoidable act of sitting, lying, or sleeping at night while being involuntarily homeless." <u>Id</u>.

///
///
///
///

1    That court further reasoned that "[a] closer analysis of
2    Robinson and Powell instructs that the involuntariness of the act
3    or condition the City criminalizes is the critical factor
4    delineating a constitutionally cognizable status, and incidental
5    conduct which is integral to and an unavoidable result of that
6    status, from acts or conditions that can be criminalized
7    consistent with the Eighth Amendment."  Id.

8         The Jones court acknowledged that "[a]t a minimum, Robinson
9    establishes that the state may not criminalize 'being'; that is,
10   the state may not punish a person for who he is, independently of
11   anything he has done."  Id., 444 F.3d at 1133.  Nevertheless, by
12   parsing together Justice White's concurrence in Powell with the
13   Powell dissent, the Jones court then made the analytical leap to
14   the conclusion that "as five Justices would later make clear in
15   Powell, Robinson also supports the principle that the state
16   cannot punish a person for certain conditions, either arising
17   from his own acts or contracted involuntarily, or acts that he is
18   powerless to avoid."  Id.

19        As can be expected from the above discussion of both
20   Robinson and Powell, the Jones majority had to labor to reach its
21   conclusion.  The strain of this exercise is particularly clear
22   from the majority's lengthy caveat that:
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

27

Notwithstanding [the] differences, five Justices in
Powell understood Robinson to stand for the proposition
that the Eighth Amendment prohibits the state from
punishing an involuntary act or condition if it is the
unavoidable consequence of one's status of being.  See
Powell, 392 U.S. at 548, 550 n.2 (White, J., concurring
in the judgment); Id., at 567 (Fortas, J., dissenting);
see also Robert L. Misner, The New Attempt Laws:
Unsuspected Threat to the Fourth Amendment, 33 Stan. L.
Rev. 201, 219 (1981) ("[T]he consensus [of White and
the dissenters apparently] was that an involuntary act
does not suffice for criminal liability.").  Although
this principle did not determine the outcome in Powell,
it garnered the considered support of a majority of the
court.  Because the conclusion that certain involuntary
acts could not be criminalized was not dicta, see
United States v. Johnson, 256 F.3d 895, 915, 914-16
(9th Cir. 2001) (en banc) (Kozinski, J., concurring)
(narrowly defining dicta as "a statement [that] is made
casually and without analysis,...uttered in passing
without due consideration of the alternatives,
or...merely a prelude to another legal issue that
commands" the court's full attention), we adopt this
interpretation of Robinson and the Cruel and Unusual
Punishment Clause as persuasive authority.
We also note that in the absence of any agreement
between Justice White and the plurality on the meaning
of Robinson and the commands of the Cruel and Unusual
Punishment Clause, the precedential value of the Powell
plurality opinion is limited to its precise facts.
"When a fragmented Court decides a case and no single
rational explaining the result enjoys the assent of
five Justices, the holding of the Court may be viewed
as that position taken by those members who concurred
in the judgments on the narrowest grounds...."  Marks
v. United States, 430 U.S. 188, 193 (1977) (omission in
original) (internal quotation marks omitted); see also
Kent Grenawalt, "Uncontrollable" Actions and the Eighth
Amendment: Implications of Powell v. Texas, 69 Colum.
L.Rev. 927, 931 (1969) ("[T]he dissent comes closer to
speaking for a majority of the Court than does the
plurality opinion.").

Id., 444 F.3d at 1135-1136.

///

///

///

///

///

28

Thus, based on an analysis that was tenuous at best, the Jones Court determined that "[f]ollowing Robinson's holding that the state cannot criminalize pure status, and the agreement of five Justices in Powell that the state cannot criminalize certain involuntary conduct, there are two considerations relevant to defining the Cruel and Unusual Punishment Clause's limits on the state's power to criminalize. The first is the distinction between pure status-the state of being-and pure conduct-the act of doing. The second is the distinction between an involuntary act or condition and a voluntary one. Accordingly, in determining whether the state may punish a particular involuntary act or condition, [the court was] guided by Justice White's admonition that '[t]he proper subject of inquiry is whether volitional acts brought about the 'condition' and whether those acts are sufficiently proximate to the 'condition' for it to be permissible to impose penal sanctions on the 'condition.'" Id., 444 F.3d at 1136 (internal citations omitted).

Consequently, the Jones court held "just as the Eighth Amendment prohibits the infliction of criminal punishment on an individual for being a drug addict; or for involuntary public drunkenness that is an unavoidable consequence of being a chronic alcoholic without a home; the Eighth Amendment prohibits the City from punishing involuntary sitting, lying, or sleeping on public sidewalks that is an unavoidable consequence of being human and homeless without shelter." Id., 444 F.3d at 1138.

///

///

///

Nevertheless, despite any similarities between Jones and the instant case, this Court is not now bound by the majority's rationale and cannot today accept its logic. Rather, this Court finds the Jones dissent to be the more persuasive and well-reasoned opinion. Accordingly, the Court will now incorporate that opinion into its own analysis of the current dispute.

First, "[t]here is no question that homelessness is a serious problem and the plight of the homeless, a cause for serious concern. Yet this does not give us license to expand the narrow limits that, in a 'rare type of case,' the Cruel and Unusual Punishment Clause of the Eighth Amendment places on substantive criminal law."[3] Id., 444 F.3d at 1138-1139 (Rymer, J., dissenting).

Additionally, "both the [Supreme] Court and [the Ninth Circuit] have constrained this category of Eighth Amendment violation to persons who are being punished for crimes that do not involve conduct that society has an interest in preventing."[4] Id. at 1139.

---

[3] Indeed, perhaps the most fundamental difference between those "rare" cases where the Cruel and Unusual Punishment Clause may come into play and the instant case is the lack of any allegation that Plaintiffs' condition or status is a "disease" or the product of a "disease." Nevertheless, Plaintiffs argue that, though the criminal convictions challenged in both Robinson and Powell were allegedly derivative of the disease of chemical dependancy, such logic should now be extended to conduct necessarily derivative of Plaintiff's involuntary homelessness. Neither Robinson nor Powell support such an extension.

[4] Though not directly pertinent to the instant disposition, the Court can imagine numerous government interests vitally affected by the enforcement of the currently challenged ordinances. At the forefront of these concerns is the City's interest in protecting human health and safety, not just that of the individuals seeking shelter, but that of the general public as well.

Accordingly, the Amendment is inapplicable in this case where the challenged ordinance "does not punish people simply because they are homeless. It targets conduct."[5] <u>Id.</u>, 444 F.3d at 1139.

Moreover, "[n]either the Supreme Court nor any other circuit court of appeals has ever held that conduct derivative of a status may not be criminalized...[N]ot even the <u>Powell</u> dissent would go so far as to hold that conduct which is closely related to status may not constitutionally be punished unless the conduct is 'a characteristic and involuntary part of the pattern of the [status] as it afflicts' the particular individual." <u>Id</u>. "Nor...has the Supreme Court or any other circuit court of appeals intimated (let alone held) that status plus a condition which exists on account of discretionary action by someone else is the kind of 'involuntary' condition that cannot be criminalized...The ramifications of so holding are quite extraordinary.

///

---

[5] Notably, even if the <u>Jones</u> logic were applicable here, the statute in this case is distinguishable even from <u>Jones</u>. The <u>Jones</u> court itself acknowledged that the Los Angeles ordinance was "one of the most restrictive municipal laws regulating public spaces in the United States. The City [could] secure a conviction under the ordinance against anyone who merely sits, lies, or sleeps in a public way at any time of day. Other cities' ordinances similarly directed at the homeless provide ways to avoid criminalizing the status of homelessness by making an element of the crime some conduct in combination with sitting, lying, or sleeping in a state of homelessness. For example, Las Vegas prohibits standing or lying in a public way only when it obstructs pedestrian or vehicular traffic. Others, such as Portland, prohibit 'camping' in or upon any public property or public right of way. Still others contain safe harbor provisions such as limiting the hours of enforcement. Other cities include as a required element sitting, lying, or sleeping in clearly defined and limited zones." <u>Id.</u>, 444 F.3d at 1123 (internal citations omitted). Accordingly, even if its premise was sound, <u>Jones</u> is distinguishable on the facts.

We do not-and should not-immunize from criminal liability those
who commit an act as a result of a condition that the
government's failure to provide a benefit has left them in." Id.

Nevertheless, Plaintiffs now attempt to stretch the reach of
Robinson further than even the Powell dissent appears to have
contemplated. However, while Plaintiffs' instant claim, that it
is unconstitutional to criminalize "being" in public in the
condition of homelessness, seeks to emulate the language of the
Powell dissent, which stated, "We deal here with the mere
condition of being intoxicated in public," this Court finds
Plaintiffs' position to be both contrary to the law, as discussed
above, and extraordinary in terms of its potential legal
ramifications. 392 U.S. at 559.

As to this latter argument, Plaintiffs assert that "[t]here
should be no 'slippery slope' concern here nor have Defendants
sought summary adjudication on this ground." Id., 16:25-26.
According to Plaintiffs, they "are not proposing that they have
an absolute right to live outside where they please or for any
length of time or in any manner." Opposition, 16:24-25. Thus,
any concerns regarding the reach of a decision in which this
Court finds unconstitutional the imposition of criminal sanctions
for conduct derivative of one's status, will be addressed and
alleviated "at the point in time that plaintiffs frame the
specifics of their request for injunctive relief and present
their claims at trial." Id., 17:1-2. Plaintiffs' argument is
not persuasive.

///

///

1   First, in his dissent in <u>Robinson</u>, Justice White observed,

2   "The Fourteenth Amendment is today held to bar any prosecution

3   for addiction regardless of the degree or frequency of use, and

4   the Court's opinion bristles with indications of further

5   consequences.  If it is 'cruel and unusual punishment' to convict

6   appellant for addiction, it is difficult to understand why it

7   would be any less offensive to the Fourteenth Amendment to

8   convict him for use on the same evidence of use which proved he

9   was an addict."  <u>Robinson</u>, 370 U.S. at 688 (White, J.,

10  dissenting).

11  Justice White went on to warn, "I deem this application of

12  'cruel and unusual punishment' so novel that I suspect the Court

13  was hard put to find a way to ascribe to the Framers of the

14  Constitution the result reached today rather than to its own

15  notions of ordered liberty.  If this case involved economic

16  regulation, the present Court's allergy to substantive due

17  process would surely save the statute and prevent the Court from

18  imposing its own philosophical predilections upon state

19  legislatures or Congress."  <u>Id</u>., 370 U.S. 689.

20  The plurality opinion in <u>Powell</u> echoed Justice White's

21  concerns stating, "Ultimately, then, the most troubling aspects

22  of this case, were <u>Robinson</u> to be extended to meet it, would be

23  the scope and content of what could only be a constitutional

24  doctrine of criminal responsibility.

25  ///

26  ///

27  ///

28  ///

33

In dissent it is urged that the decision could be limited to conduct which is 'a characteristic and involuntary part of the pattern of the disease as it afflicts' the particular individual and that '[i]t is not foreseeable' that it would be applied 'in the case of offenses such as driving a car while intoxicated, assault, theft, or robbery.'  That is limitation by fiat.  In the first place, nothing in the logic of the dissent would limit its application to chronic alcoholics.  If Leroy Powell cannot be convicted of public intoxication, it is difficult to see how a State can convict an individual for murder, if that individual, while exhibiting normal behavior in all other respects, suffers from a 'compulsion' to kill, which is an 'exceedingly strong influence,' but 'not completely overpowering.'  Even if we limit our consideration to chronic alcoholics, it would seem impossible to confine the principle within arbitrary bounds which the dissent seems to envision."  Powell, 392 U.S. 534.

The plurality further reasoned that "in any event this Court has never articulated a general constitutional doctrine of mens rea."  Id., 392 U.S. 535.  Furthermore, it observed, "We cannot cast aside the centuries-long evolution of the collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds.  The doctrines of actus reus, mens rea, insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man.

34

This process of adjustment has always been thought to be the province of the States."[6]  Id., 392 U.S. at 535-536.

In his concurrence in Powell, Justice Black articulated similar concerns, "[T]he basic premise underlying the argument is that it is cruel and unusual to punish a person who is not morally blameworthy...But the question here is one of constitutional law.  The legislatures have always been allowed wide freedom to determine the extent to which moral culpability should be a prerequisite to conviction of a crime.  The criminal law is a social tool that is employed in seeking a wide variety of goals, and [the Court] cannot say the Eighth Amendment's limits on the use of criminal sanctions extend as far as this viewpoint would inevitably carry them."  Id., 392 U.S. 544-545.

"[E]ven if [the Court] were to limit any holding in this field to 'compulsions' that are 'symptomatic' of a 'disease,' in the words of the findings of the trial court, the sweep of that holding would still be startling.

///

_____

[6] Indeed, under our criminal system, Plaintiffs' current claim is better couched in terms of a defense to criminal conviction than as a constitutional argument.  Under California law, Plaintiffs can raise a necessity defense under which each individual Plaintiff is free to argue that he violated the law "(1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency."  In re Eichorn, 69 Cal. App. 4th 382, 389 (4th Dist. 1991).  At that point, individual inquiry into whether each then-defendant actually had viable options for shelter or was, instead, on the street for wholly involuntary reasons, could be properly had.  Such an inquiry, however, has never been constitutionally mandated and, rather, has been historically left to the criminal law itself.  See Powell, 392 U.S. at 536.

Such a ruling would make it clear beyond any doubt that a narcotics addict could not be punished for 'being' in possession of drugs or, for that matter, for 'being' guilty of using them. A wide variety of sex offenders would be immune from punishment if they could show that their conduct was not voluntary but part of the pattern of a disease.  More generally speaking, a form of the insanity defense would be made a constitutional requirement throughout the Nation, should the Court now hold it cruel and unusual to punish a person afflicted with any mental disease whenever his conduct was part of the pattern of this disease and occasioned by a compulsion symptomatic of the disease."  Id., 392 U.S. at 545.

Finally, Justice White, who had earlier warned of the ramifications inherent in the Robinson decision, stated in his Powell concurrence, "If it cannot be a crime to have an irresistible compulsion to use narcotics, I do not see how it can constitutionally be a crime to yield to such a compulsion. Punishing an addict for using drugs convicts for addiction under a different name . . . Unless Robinson is to be abandoned, the use of narcotics by an addict must be beyond the reach of the criminal law.  Similarly, the chronic alcoholic with an irresistible urge to consume alcohol should not be punishable for drinking or for being drunk."  Id., 392 U.S. 548-549.

Nonetheless, despite the grave precedential ramifications of the instant argument, Plaintiffs today ask this Court to rely on the language of the majority in Jones and to hold, if not in so many words, that the existence of some form of mens rea is a constitutional prerequisite to a criminal conviction.

36

However, based on the above discussion, this Court finds such a holding, even to the extent it may have followed from <u>Jones</u>, to be contrary to both the spirit and the letter of the law. Indeed, such a holding would require this Court to couch its own moral beliefs in constitutional terms and to substitute its own judgment as to the morality of the criminal law for that of the states.  That the Court will not do.

A decision in Plaintiffs' favor would set precedent for an onslaught of challenges to criminal convictions by those who seek to rely on the involuntariness of their actions.  It would potentially provide constitutional recourse to anyone convicted on the basis of conduct derivative of a condition he is allegedly "powerless to change."  While this Court is sympathetic to the plight of Plaintiffs in this case, as well as to that of all individuals who are without shelter, a decision in favor of Plaintiffs today would be dangerous bordering on irresponsible. Accordingly, the Court now finds that Plaintiffs' Eighth Amendment claims fail as a matter of law.  City Defendants' Motion for Summary Judgment is granted.

**2.    Second Cause of Action: Violation of the Fourth and Fourteenth Amendments**

As to this second cause of action, Plaintiffs allege that they "have lost property seized or left behind by the City without receiving any notice...and, even more fundamentally, their property was destroyed on the spot without any opportunity to retrieve it after confiscation."  Opposition, 19-22.
///

37

"Plaintiffs have a legitimate expectation of privacy in their property and, thus, the property is protected by the Fourth Amendment." Justin v. City of Los Angeles, 2000 WL 1808426, *9 (C.D. Cal. 2000).

Defendants do not challenge the validity of Plaintiffs' legal argument and instead attack Plaintiffs' evidence. As such, Defendants point out that no named Plaintiffs allege or attempt to show that any of the individual Defendants ever confiscated their property. Thus, the individual City Defendants' Motion is granted as to all Plaintiffs, and the only claims that remain to be addressed are those directed toward the City.

"Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." <u>Monell v. Dept. of Social Servs. Of City of New York</u>, 436 U.S. 658, 690 (1978). "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where...the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." <u>Id</u>. Additionally, "local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has no received formal approval through body's official decisionmaking channels." <u>Id</u>. at 690-691.

///

///

///

However, Defendants argue that 1) only one named Plaintiff
has alleged her property was taken and, therefore, the remaining
Plaintiffs lack standing; and 2) the statement of that one named
Plaintiff is insufficient to establish the requisite pattern or
practice as a matter of law.  Nevertheless, there is sufficient
evidence in the record to sustain at least Plaintiff Hopson's
instant claim.

First, Plaintiff Hopson has submitted a declaration by which
she testifies that unnamed city officials confiscated her
property.  Additionally, several other homeless individuals have
also submitted affidavits indicating they have been the victim of
or witnessed such deprivations of property.  Furthermore,
Plaintiffs submitted evidence that the City posted notices
warning that any "abandoned" property would be disposed.
Finally, Defendants cite to no authority, nor is the Court aware
of any, standing for the proposition that, in order to properly
maintain a <u>Monell</u> claim, multiple named Plaintiffs must allege to
have suffered the same harm.

At this juncture, the Court is not willing to say there are
no triable issues of fact as to the claims of Plaintiff Hopson
such that summary judgment in favor of the City is warranted.
However, the remaining named individual Plaintiffs have failed to
submit any evidence capable of creating a triable issue of fact
as to each of their claims for relief under this second cause of
action.

///

///

///

Furthermore, the entity Plaintiffs lack standing to bring this claim.[7]  Accordingly, the City's Motion as to the remaining individual Plaintiffs is granted.

**CONCLUSION**

In sum, Defendants' Motion for Summary Judgment or Summary Adjudication (Docket No. 33) is GRANTED in part and DENIED in part.  The City Defendants' Motion for Summary Adjudication is GRANTED as to all Plaintiffs' First Cause of Action.  The individual City Defendants' Motion for Summary Adjudication is also GRANTED as to all Plaintiffs' Second Cause of Action.  Additionally, the City's Motion for Summary Adjudication as to this Second Cause of Action is DENIED as to Plaintiff Hopson and GRANTED as to all other Plaintiffs.

IT IS SO ORDERED.

Dated: May 19, 2009

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[7] "The constitutional limitations of article III contain three components: (1) a threatened or actual distinct and palpable injury to the plaintiff (2) a fairly traceable causal connection between the alleged injury and the defendant's challenged conduct; and (3) a substantial likelihood that the requested relief will redress or prevent the injury."  Viceroy Gold Corp. v. Aubry, 75 F.3d 482, 488 (9th Cir. 1996), quoting Hong Kong Supermarket v. Kizer, 830 F.2d 1078, 1081 (9th Cir. 1987) (quotations omitted).  The entities in this case claim to suffer injury by way of the confiscation of Plaintiffs' property because these entities task themselves with replacing those items.  That injury is simply too attenuated, not to mention voluntarily inflicted, to suffice to establish standing here.